# 14-554-cv

## United States Court of Appeals
### for the
## Second Circuit

⯈⯈ ⯇⯇

YUKOS CAPITAL S.A.R.L.,

*Petitioner-Appellee,*

— v. —

OAO SAMARANEFTEGAZ,

*Respondent-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF RESPONDENT-APPELLANT
## OAO SAMARANEFTEGAZ

<table>
<tr>
<td>

Kathleen M. Sullivan
Yelena Konanova
Cleland B. Welton II
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7000

</td>
<td>

Matthew D. Slater
CLEARY GOTTLIEB STEEN &
  HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
202-974-1500

</td>
</tr>
</table>

Attorneys for Respondent-Appellant

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Respondent-Appellant OAO Samaraneftegaz states that it is an open joint stock company organized and existing under the laws of the Russian Federation and is wholly owned by OOO Neft-Aktiv and is indirectly owned by Rosneft Oil Company.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT........................................i

TABLE OF AUTHORITIES ...............................................................iv

PRELIMINARY STATEMENT ........................................................1

JURISDICTIONAL STATEMENT ....................................................5

ISSUES PRESENTED....................................................................6

STATEMENT OF THE CASE..........................................................8

    A.    The Parties And The Loan Agreements ...............................8

    B.    The Arbitration And Award ...............................................9

    C.    The Neft-Aktiv Litigation .................................................10

    D.    The Russian And New York Enforcement Proceedings....................11

        1.    The Russian Enforcement Decision.........................................11

        2.    The New York Enforcement Decision....................................12

    E.    The Post-Judgment Orders On Appeal .............................13

STANDARDS OF REVIEW ...........................................................20

SUMMARY OF ARGUMENT ........................................................21

ARGUMENT ...............................................................................23

I.    THE DISTRICT COURT WRONGLY REQUIRED SAMARANEFTEGAZ TO TURN OVER RUSSIAN ASSETS IN SATISFACTION OF THE JUDGMENT...............................................................................23

    A.    The Turnover Order Offends Comity By Commanding Samaraneftegaz To Violate Russian Law, Contrary To Both U.S. and Russian Interests...............................................23

        1.    A Proper Comity Analysis Is A Mandatory Prerequisite For An Order Imposing Obligations Inconsistent With Foreign Law ...........................................................24

2.      The Comity Factors Heavily Favor Vacating The
        Turnover Order ........................................................37

    B.      The Turnover Order Violates New York Law ...................................44

II.     THE DISTRICT COURT ERRED IN ISSUING AN INJUNCTION TO
        SUPPORT THE TURNOVER ORDER ........................................48

    A.      Rule 65's Requirements Were Not Met ...........................................48

        1.      Yukos Capital Failed To Establish Irreparable Harm.............48

        2.      Yukos Capital Has Adequate Remedies At Law ....................51

        3.      The Balance Of Hardships Favors Samaraneftegaz ...............51

        4.      The Injunction Disserves The Public Interest.........................52

    B.      New York Law Does Not Govern Samaraneftegaz's
            Distribution Of Its Russian Assets ....................................53

III.    THE DISTRICT COURT ERRED IN ORDERING FURTHER
        DISCOVERY RESPONSES AND AWARDING ATTORNEY'S FEES ..55

    A.      The Requested Further Information Is Outside The Scope Of
            Proper Post-Judgment Discovery .......................................55

    B.      The District Court Erred In Awarding Attorney's Fees....................61

CONCLUSION ........................................................62

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(C)..........................64

# TABLE OF AUTHORITIES

**Cases**

Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo,
190 F.3d 16 (2d Cir. 1999) ................................................................46

Amoco Prod. Co. v. Vill. of Gambell,
480 U.S. 531 (1987)...........................................................................52

Argentina v. NML Capital, Ltd.,
573 U.S. __, slip op. (June 16, 2014) ........................................ 55-58

Ballek v. First Media Mktg.,
879 N.Y.S.2d 847, 24 Misc. 3d 532 (N.Y. Sup. Ct. 2009)................47

Banco Central De Paraguay v. Paraguay Humanitarian Foundation,
Inc.,
No. 01 Civ. 9649(JFK), 2006 WL 3456521 (S.D.N.Y. Nov. 30,
2006) ..................................................................................................59

Banco Popular N. Am. v. Philian Designs LLC,
852 N.Y.S.2d 109, 48 A.D.3d 368 (N.Y. App. Div. 2008) ...............47

Bano v. Union Carbide Corp.,
361 F.3d 696 (2d Cir. 2004) ..............................................................52

Beiser v. Weyler,
284 F.3d 665 (5th Cir. 2002) .............................................................41

Belize Soc. Dev. Ltd. v. Gov't of Belize,
668 F.3d 724 (D.C. Cir. 2012)...........................................................40

Bravado Int'l Grp. Merch. Servs. v. Ninna, Inc.,
655 F. Supp. 2d 177 (E.D.N.Y. 2009) ...............................................54

British Int'l Ins. Co. v. Seguros La Republica, S.A.,
No. 90 Civ. 2370(JFK)(FM), 2000 WL 713057 (S.D.N.Y. June 2,
2000) ..................................................................................................56

Brown v. Coleman,
   No. 07 Civ. 1345(LMM)(RLE), 2009 WL 2877602 (S.D.N.Y.
   Sept. 8, 2009) ................................................................................60

CIMC Raffles Offshore (Sing.) Pte. Ltd. v. Schahin Holding S.A.,
   No. 13 Civ. 52(JSR), 2013 WL 4082973 (S.D.N.Y. Aug. 6, 2013)..................46

Competex, S.A. v. Labow,
   783 F.2d 333 (2d Cir. 1986) .............................................................51

E.E.O.C. v. KarenKim, Inc.,
   698 F.3d 92 (2d Cir. 2012) ..............................................................20

eBay Inc. v. MercExchange, L.L.C.,
   547 U.S. 388 (2006)........................................................................48

EM Ltd. v. Argentina,
   695 F.3d 201 (2d Cir. 2012) ......................................................55, 57

Empresa Cubana del Tabaco v. Culbro Corp.,
   541 F.3d 476 (2d Cir. 2008) .............................................................20

Fromer v. Yogel,
   50 F. Supp. 2d 227 (S.D.N.Y. 1999) ...................................................54

Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,
   527 U.S. 308 (1999)........................................................................50

Gryphon Domestic VI, LLC v. APP International Finance Co.,
   41 A.D.3d 25, 836 N.Y.S.2d 4 (N.Y. App. Div. 2007) ................................ 46-47

Hartford Fire Ins. Co. v. Cal.,
   509 U.S. 764 (1993)........................................................................27

Hollander v. Am. Cyanamid Co.,
   895 F.2d 80 (2d Cir. 1990) ..............................................................20

In re "Agent Orange" Prod. Liab. Litig.,
   373 F. Supp. 2d 7 (E.D.N.Y. 2005) ....................................................52

In re Maxwell Commc'n Corp.,
   93 F.3d 1036 (2d Cir. 1996) ........................................................ 25-26

In re S. African Apartheid Litig.,
    617 F. Supp. 2d 228 (S.D.N.Y. 2009) ........................................... 32-33

In re World Trade Ctr. Disaster Site Litig.,
    722 F.3d 483 (2d Cir. 2013) ................................................................59

Interpool Ltd. v. Patterson,
    No. 89 Civ 8501 (LAK), 1995 WL 105284 (S.D.N.Y. Mar. 13,
    1995) ....................................................................................................45

Iran Aircraft Indus. v. Avco Corp.,
    980 F.2d 141 (2d Cir. 1992) ................................................................40

Jiggetts v. AlliedBarton Sec. Servs.,
    423 Fed. App'x 24 (2d Cir. 2011) .......................................................21

JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.,
    412 F.3d 418 (2d Cir. 2005) ......................................................... 20-21

JW Oilfield Equip., LLC v. Commerzbank AG,
    764 F. Supp. 2d 587 (S.D.N.Y. 2011) .........................................32, 37

Kamerling v. Massanari,
    295 F.3d 206 (2d Cir. 2002) ................................................................48

Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas
    Bumi Negara,
    500 F.3d 111 (2d Cir. 2007) ................................................................41

Klein v. Torrey Point Grp., LLC,
    No. 12 Civ. 1190(KPF), 2013 WL 5761401 (S.D.N.Y. Oct. 23,
    2013) ....................................................................................................62

Koehler v. Bank of Bermuda, Ltd.,
    911 N.E.2d 825, 12 N.Y.3d 533 (2009)..............................................46

Laker Airways, Ltd. v. Sabena, Belgian World Airlines,
    731 F.2d 909 (D.C. Cir. 1984)............................................................39

Lamar Adver. of Penn, LLC v. Town of Orchard Park,
    356 F.3d 365 (2d Cir. 2004) ................................................................5

Madanes v. Madanes,
 186 F.R.D. 279 (S.D.N.Y. 1999) ....................................................... 38

Marshak v. Green,
 746 F.2d 927 (2d Cir. 1984) ............................................................. 44

Milliken & Co. v. Bank of China,
 758 F. Supp. 2d 238 (S.D.N.Y. 2010) ............................................... 38

Minpeco, S.A. v. Hunt,
 No. 81 CIV. 7619(MEL), 1989 WL 57704 (S.D.N.Y. May 24,
 1989) ................................................................................................. 55

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,
 473 U.S. 614 (1985) .......................................................................... 40

Motorola Credit Corp. v. Uzan,
 388 F.3d 39 (2d Cir. 2004) ............................................................... 27

Oil City Petrl. Co. v. Fabac Realty Corp.,
 418 N.Y.S.2d 51, 70 A.D.2d 859 (N.Y. App. Div. 1979), aff'd, 50
 N.Y.2d 853, 407 N.E.2d 1334 (1980) ................................................ 47

Pac. Fisheries, Inc. v. United States,
 484 F.3d 1103 (9th Cir. 2007) .......................................................... 61

Pashaian v. Eccelston Properties, Ltd.,
 88 F.3d 77 (2d Cir. 1996) ................................................................. 50

Perkins v. Chelsea Piers Mgmt.,
 No. 11 Civ. 8998(ALC)(JCF), 2012 WL 4832814 (S.D.N.Y. Oct.
 10, 2012) ........................................................................................... 56

Robert Lewis Rosen Assocs., Ltd. v. Webb,
 473 F.3d 498 (2d Cir. 2007) ............................................................. 49

Sabre Shipping Corp. v. Am. President Lines, Ltd.,
 285 F. Supp. 949 (S.D.N.Y. 1968) .................................................... 36

Samsun Logix Corp. v. Bank of China,
 929 N.Y.S.2d 202, 31 Misc. 3d 1126(A), (N.Y. Sup. Ct. 2011) ......... 46

Schlumberger Tech. Corp. v. United States,
    195 F.3d 216 (5th Cir. 1999) ................................................................49

Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct.,
    482 U.S. 522 (1987)............................................................... 24, 60-61

Ssangyong Corp. v. Vida Shoes Int'l, Inc.,
    No. 03 Civ 5014 (KMW), 2004 WL 1125659 (S.D.N.Y. May 20,
    2004) ........................................................................................37

State of N.Y. v. Shore Realty Corp.,
    763 F.2d 49 (2d Cir. 1985) ..................................................................5

Sterling Drug, Inc. v. Bayer AG,
    14 F.3d 733 (2d Cir. 1994) ................................................................27

TermoRio S.A.E.S.P. v. Electranta S.P.,
    487 F.3d 928 (D.C. Cir. 2007)............................................................41

Thai Lao Lignite (Thai.) Co. v. Gov't of the Lao People's Dem. Rep.,
    No. 10 Civ. 5256(KMW), 2011 WL 4111504 (S.D.N.Y. Sept. 13,
    2011) ........................................................................................62

Transaero, Inc. v. La Fuerza Aerea Boliviana,
    162 F.3d 724 (2d Cir. 1998) ..............................................................20

United States v. Aluminum Co. of Am.,
    148 F.2d 416 (2d Cir. 1945) ..............................................................25

United States v. Brodie,
    174 F. Supp. 2d 294 (E.D. Pa. 2001)..................................................36

United States v. Davis,
    767 F.2d 1025 (2d Cir. 1985) ..................................... 24-25, 33, 37, 42

United States v. First Nat'l City Bank,
    396 F.2d 897 (2d Cir. 1968) ...............................24-25, 27, 37, 42-43

United States v. Funds Held ex rel. Wetterer,
    210 F.3d 96 (2d Cir. 2000) ................................................................53

United States v. One Gulfstream G-V Jet Aircraft,
    941 F. Supp. 2d 1 (D.D.C. 2013)........................................................36

United States v. Ross,
  302 F.2d 831 (2d Cir. 1962) .................................................................52

Universitas Educ., LLC v. Nova Grp., LLC,
  No. 11 Civ. 1590(LTS)(HBP), 2013 WL 3328746 (S.D.N.Y. July
  2, 2013) ................................................................................................60

Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.,
  930 F.2d 1021 (2d Cir. 1991) .............................................................20

Wultz v. Bank of China Ltd.,
  910 F. Supp. 2d 548 (S.D.N.Y. 2012) ................................................38

**Statutes**

9 U.S.C. § 203 .......................................................................................5

28 U.S.C. § 1291 ...................................................................................5

28 U.S.C. § 1292(a)(1) ...........................................................................5

N.Y. C.P.L.R. 5201 ..............................................................................45

N.Y. C.P.L.R. 5222 .........................................................................53, 55

N.Y. C.P.L.R. 5225 .........................................................14, 25, 45, 47

N.Y. C.P.L.R. 5304(b) ..........................................................................35

**Rules**

Fed. R. Civ. P. 26(b)(2)(C) ..................................................................60

Fed. R. Civ. P. 33 ............................................................................59-60

Fed. R. Civ. P. 37(a)(5)(A) ..................................................................62

Fed. R. Civ. P. 44.1 ..............................................................................21

Fed. R. Civ. P. 59(e) .............................................................................15

Fed. R. Civ. P. 60(b) .............................................................................15

Fed. R. Civ. P. 65 ............................................................................48, 53

Fed. R. Civ. P. 69(a) ..................................................................... 44, 55-56

S.D.N.Y. Local Civ. R. 33.3(b) ............................................................59

**Other Authorities**

Alan Redfern et al., <u>Redfern And Hunter On International Arbitration</u>
§ 10.81 (2009) ........................................................................40

Convention on Jurisdiction and the Recognition and Enforcement of
Judgments in Civil and Commercial Matters, Jan. 1, 2010, 2007
O.J. (L 339) 3 .......................................................................35

Convention on the Recognition and Enforcement of Foreign Arbitral
Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ....................1, 11, 39

Convention on the Recognition and Enforcement of Foreign
Judgments in Civil and Commercial Matters art. 5(3), Hague
Conference on Private International Law, Feb. 1, 1971 .....................................35

Council Regulation (EC) No. 44/2001, On Jurisdiction and the
Recognition and Enforcement of Judgments in Civil and
Commercial Matters, Dec. 22, 2000, 2001 O.J. (L 12) 1 ...................................35

Gary B. Born, <u>International Arbitration: Law And Practice</u> (2012).......................40

Inter-American Convention on Extraterritorial Validity of Foreign
Judgments and Arbitral Awards, May 8, 1997, 1439 U.N.T.S. 90 ...................35

James Wm. Moore et al., <u>Moore's Federal Practice</u> (3d ed. 2013) ....... 55-56, 59, 61

Restatement (Second) Foreign Relations Law of the United States §
40 (1965) ........................................................................ 37-38, 44

Restatement (Second) of Conflict of Laws § 53 cmt. d (1971) ..............................43

Restatement (Third) of Foreign Relations Law of the United States
(1987) ...........................................................................35, 37, 43, 53

## PRELIMINARY STATEMENT

This appeal concerns the District Court's attempt to reach assets in Russia to satisfy its judgment confirming an international arbitration award, even though Russian courts have denied recognition and enforcement of the same award and have deemed the transactions underlying the award criminal in nature and unenforceable. By reaching into Russia to compel payment of a judgment that is, for all practical purposes, invalid in Russia, without undertaking any sort of comity analysis, the District Court ran afoul of the United States' commitment to country-by-country enforcement under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("NY Convention"), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38. The District Court compounded its errors by compelling extensive discovery on assets that, for the same reasons, cannot be used to satisfy the judgment and therefore fall outside the scope of permissible discovery.

The underlying arbitral award, which deemed Respondent-Appellant OAO Samaraneftegaz ("Samaraneftegaz") liable to pay Petitioner-Appellee Yukos Capital S.a.r.l. ("Yukos Capital") under certain loan agreements , was issued on August 15, 2007, by a tribunal of the International Chamber of Commerce ("ICC"), following arbitral proceedings in which Samaraneftegaz did not participate (the "Award"). After obtaining the Award, Yukos Capital sought to

enforce it under the NY Convention in parallel proceedings in Russia (where all of Samaraneftegaz's assets, operations, and personnel are located) and in New York (a jurisdiction with which Samaraneftegaz has no connection other than these proceedings).

The Russian court declined to enforce the Award on the bases that Samaraneftegaz did not receive proper notice of the arbitral proceedings and that its enforcement would violate Russian public policy. In separate proceedings in Russia, in which Yukos Capital and Samaraneftegaz both fully participated, Russian courts also held that the loan agreements underlying the Award were "shams" concocted as part of a money laundering scheme in which Yukos Capital played a pivotal part and of which Samaraneftegaz was a victim. The U.S. District Court, on the other hand, granted recognition and enforcement of the Award under U.S. law in an October 3, 2013 supplemental final judgment (the "Judgment") (which Judgment is the subject of a parallel appeal to this Court, No. 13-3357-cv). In the post-Judgment orders on appeal in this case, the District Court ordered Samaraneftegaz to "turnover" unspecified Russian assets to satisfy the Judgment, restrained and enjoined Samaraneftegaz from transferring assets to any corporate affiliate before paying or bonding the Judgment, permitted broad discovery into Samaraneftegaz's operations and assets, and also awarded Yukos Capital attorney's fees.

Thus, Russian courts have refused to enforce the Award and deemed the underlying transactions unlawful, whereas the U.S. District Court confirmed the Award and ordered satisfaction of it against Samaraneftegaz's assets located in Russia. That alone places the orders of the Russian courts in direct conflict with the orders of the District Court here, yet the District Court failed to conduct any analysis of international comity. The mandatory comity analysis, had the District Court conducted it, necessarily would have led it to refuse to enter the turnover order, not least because compliance with the turnover order would subject Samaraneftegaz's employees to criminal liability. Under the final and binding decisions by Russian courts, any use by Samaraneftegaz of its Russian assets to pay the Judgment – effectively the same as paying the Award or underlying loan agreements – would constitute criminal money laundering or misappropriation, and any Samaraneftegaz employee who caused such a payment to be made would be exposed to criminal and civil liability. Moreover, in these circumstances, the District Court's injunction of Samaraneftegaz from paying dividends or transferring any of its Russian assets to its corporate affiliates without fair consideration effectively serves only a punitive purpose given that those assets cannot be used to pay the Judgment.

The District Court's order allowing massive discovery into Samaraneftegaz's Russian assets and operations exhibits the same disregard for the

constraints imposed by the Russian court decisions, given that the Russian assets could not be used to satisfy the Judgment. The District Court's order that Samaraneftegaz pay Yukos Capital's attorney's fees for its motion to compel further discovery, even though Samaraneftegaz's objection to discovery regarding assets that cannot be reached was substantially justified, is similarly improper.

The District Court's orders should be reversed.

## JURISDICTIONAL STATEMENT

The District Court (Crotty, J.) had subject matter jurisdiction under 9 U.S.C. § 203. Samaraneftegaz timely appealed from the January 23, 2014 "turnover" order on February 21, 2014, and from the District Court's April 2, 2014 denial of its motion to alter or amend that order on April 11, 2014. This Court has jurisdiction over the appeal from those orders pursuant to 28 U.S.C. §§ 1291 and 1292(a)(1).

Samaraneftegaz timely appealed from the District Court's April 18, 2014 and May 14, 2014 orders granting Yukos Capital's motion to compel discovery and ordering Samaraneftegaz to pay Yukos Capital's attorney's fees on May 16, 2014. This Court has jurisdiction over the appeal of the orders to pay attorney's fees under 28 U.S.C. § 1291. This Court has pendent appellate jurisdiction over the appeal of the April 18 post-judgment discovery order because such appeal is inextricably intertwined with the appeals of the final orders on turnover and attorney's fees. See Lamar Adver. of Penn, LLC v. Town of Orchard Park, 356 F.3d 365, 371 (2d Cir. 2004); State of N.Y. v. Shore Realty Corp., 763 F.2d 49, 51-52 (2d Cir. 1985).

## ISSUES PRESENTED

1. Whether the District Court erred by ordering Samaraneftegaz to turn over assets located within the territorial jurisdiction of the Russian Federation, where:

   a. The District Court refused to apply the doctrine of international comity notwithstanding that Russian courts refused to honor the arbitration award on which the turnover order is based, and any person (including Samaraneftegaz's personnel) attempting to comply with the turnover order would be subject to criminal and civil liability under Russian law;

   b. Proper application of the comity doctrine would require deference to the Russian courts' refusal to allow enforcement of the award, given Russia's paramount interest in enforcement of its criminal laws and the transactions and property at issue, the NY Convention's policy of reserving to each country the right to refuse enforcement of an award, and the hardships that would arise from requiring Russian persons and entities to make payments in Russia that Russian courts have declared to be illegal and contrary to public policy; and

   c. The turnover order was obtained in violation of procedural protections embedded in governing New York law.

2.   Whether the District Court erred by enjoining Samaraneftegaz from paying dividends, making loans, or otherwise transferring within the Russian Federation assets or funds to its shareholder and corporate affiliates, where (a) relief is not warranted under the four injunction factors; and (b) the District Court improperly applied New York's property and corporations laws to Russian assets held by a Russian corporation.

3.   Whether the District Court erred by compelling post-judgment discovery and assessing attorney's fees against Samaraneftegaz, where (a) the discovery sought cannot be useful in aid of the judgment or execution, and (b) Samaraneftegaz's opposition to Yukos Capital's motion to compel was substantially justified.

## STATEMENT OF THE CASE

This appeal concerns the District Court's post-Judgment orders and not the Judgment confirming the arbitral Award itself, which is the subject of the parallel appeal in No. 13-3357-cv. Facts pertaining to the Judgment are set out below as necessary for context.

### A.    The Parties And The Loan Agreements

In 2004, Samaraneftegaz and Yukos Capital were both subsidiaries of Yukos Oil Company ("Yukos Oil"). JA-28. Samaraneftegaz is based in and conducts its business (oil production and refining) exclusively in Russia. JA-28; JA-285, ¶ 2; JA-359-360, ¶ 5; JA-700-718; JA-1178-1182.

Yukos Capital, a Luxembourg company, JA-28, played a pivotal role in an extensive scheme orchestrated by Yukos Oil to evade Russian taxes by manipulating the activities of Samaraneftegaz and its other Russian subsidiaries. As the Russian courts have found, Yukos Oil forced its Russian operating subsidiaries, including Samaraneftegaz, to sell their oil to other subsidiaries at prices far below fair market value as part of a fraudulent scheme to evade taxation of the profits on those sales. JA-82; JA-105-107; JA-111-112; JA-117-118. In the words of the Russian courts, this scheme was effected in part by "siphoning … funds from oil producing entities," including Samaraneftegaz. JA-82. It left Samaraneftegaz and its sister operating companies without recourse to their own

funds. Yukos Oil caused those funds, after evading taxes, to be transferred back to them through sham "loans" given by Yukos Capital, which was established specifically "for legalization (laundering) of money misappropriated through selling the oil stolen, among others, from OJSC Samaraneftegaz … and had no other sources [of funds]." JA-83; see also JA-324.

At issue in the arbitration between the parties were two such agreements (the "Loan Agreements"), dated July 2004, under which Yukos Capital "loaned" to Samaraneftegaz a total of 2,415,890,000 rubles. JA-28; JA-127. Sometime after October 2005, through various schemes (addressed in more detail in the parallel appeal), Yukos Oil's managers purported to amend the Loan Agreements' dispute resolution clauses to provide for arbitration in New York, under New York Law, and in English instead of in Russia, under Russian law, and in the Russian language as originally provided in the Loan Agreements. JA-29-30.[1]

## B. The Arbitration And Award

On January 17, 2006, with both sides controlled by Yukos Oil, Yukos Capital filed a demand for arbitration against Samaraneftegaz before the ICC, seeking payment under the Loan Agreements. JA-127. Samaraneftegaz was not informed of critical stages of the arbitration and did not participate in it beyond a

---

[1]     Samaraneftegaz disputes the validity of these amendments, which are at issue in the parallel appeal before this Court with docket number 13-3357-cv.

9

single letter, sent by the president of another Yukos Oil subsidiary that had been designated for a time as Samaraneftegaz's management company, denying that the ICC had jurisdiction.  JA-128.

On August 15, 2007, the ICC tribunal issued the Award, which purports to require Samaraneftegaz to pay Yukos Capital some 3.08 billion rubles, plus interest.  JA-129.

**C.      The Neft-Aktiv Litigation**

Yukos Oil went bankrupt and entered liquidation proceedings.  In May 2007, during those proceedings, Neft-Aktiv LLC acquired Samaraneftegaz as a wholly-owned subsidiary.  JA-127.  Two months later, Neft-Aktiv sued Yukos Capital and Samaraneftegaz in Samara, Russia, seeking a declaration that the Loan Agreements were invalid.  JA-129.  Yukos Capital fully participated in the Neft-Aktiv litigation and received all procedural rights afforded by Russian law.  E.g., JA-79-80.  After considering evidence submitted and arguments made by all parties, including Yukos Capital, the Samara court entered judgment declaring that the Loan Agreements are void.  JA-81-89; JA-129-130.  The basis of the Samara court's conclusion was its recognition that the Loan Agreements represented the return to Samaraneftegaz of its own funds such that the Loan Agreements were a sham, and that the agreements' central role in Yukos Oil's tax-evasion scheme meant that the transactions amounted to money laundering.  JA-81-89.

10

Yukos Capital appealed the Samara court's decision, and the Russian appellate courts upheld it at every level. JA-102-114; JA-116-119. The Samara court's judgment that the Loan Agreements are void and unenforceable is final and binding under Russian law.

**D.  The Russian And New York Enforcement Proceedings**

In the summer of 2010 Yukos Capital brought concurrent actions pursuant to the NY Convention to enforce the Award in both New York and Russia.

1.  <u>The Russian Enforcement Decision</u>

Submitting itself to the jurisdiction of the Russian courts, Yukos Capital sought to enforce the Award in Russia, where – as it acknowledged – Samaraneftegaz actually exists, operates, and has assets. <u>See</u> Hr'g Tr. 16:23-17:9, Jan. 7, 2011, ECF No. 35.[2] In February 2011, the Arbitrazh Court of the Samara Region denied Yukos Capital's petition. JA-59-67 (the "Russian Enforcement Decision"). It held the Award unenforceable on two of the grounds in Article V of the NY Convention. For one, Samaraneftegaz had not received proper notice of important steps in the arbitration. JA-63. For another, enforcement of the Award would contravene Russian public policy for three independent reasons: the Loan Agreements were not genuine transactions but rather the return to Samaraneftegaz

---

[2]  ECF numbers refer to the docket below in 1:10-cv-06147-PAC (S.D.N.Y.).

of money that had been siphoned away from it; Samaraneftegaz lacked the necessary corporate will under Russian law to enter them but rather signed only because Yukos Oil abused its control over the company;[3] and the Loan Agreements existed to further Yukos Oil's massive tax evasion scheme. JA-64-66. Yukos Capital did not appeal that decision; it is final and binding.[4]

### 2. The New York Enforcement Decision

Yukos Capital's concurrent petition before the District Court eventually resulted in the District Court's granting summary judgment to Yukos Capital and entering the Judgment confirming the Award on October 3, 2013 – two and a half years after the Arbitrazh Court had reached the opposite result. JA-126-142; JA-144-146, appeal pending, No. 13-3357-cv (2d Cir.). The District Court never had occasion before issuing the Judgment to address the impact of the Russian courts' decisions on Samaraneftegaz's ability to use its Russian assets to satisfy a U.S. judgment recognizing the Award..

---

[3]     The judgment that Yukos Oil abused its control over its subsidiaries to enter agreements contrary to their interests was shared by a tribunal of eminent arbitrators in London in a separate proceeding involving one of Samaraneftegaz's sister companies that Yukos Oil had improperly forced to sign a guarantee for the sole purpose of benefitting Yukos Oil and another Yukos Oil affiliate. See Berger Decl., Ex. AA, ¶ 494, Nov. 8, 2010, ECF No. 28; see also id., ¶¶ 79, 84 (Yukos Oil forced Samaraneftegaz to give an identical guarantee).

[4]     On June 17, 2014 Samaraneftegaz applied to the Samara Arbitrazh Court requesting clarification whether the Russian Enforcement Decision would be interpreted by that court to preclude turnover or responses to Yukos Capital's discovery requests. Samaraneftegaz also sought guidance from the Russian Prosecutor General's office. Both applications remain pending.

**E.**     **The Post-Judgment Orders On Appeal**

Yukos Capital then started its efforts to compel enforcement of the Judgment against Samaraneftegaz's Russian assets without regard for the fact that the Russian judgments had already held that such enforcement is not permitted.

First, on October 17, 2013, Yukos Capital served a battery of all-encompassing discovery requests purportedly seeking to uncover where Samaraneftegaz's assets are located.  The breadth of those requests is epitomized in one request that demands "ALL DOCUMENTS and COMMUNICATIONS ... RELATING TO goods, work or services provided by SAMARANEFTEGAZ." JA-621, ¶ 9.

In response to Yukos Capital's discovery requests, Samaraneftegaz confirmed through verified interrogatory responses that all of its assets are in Russia and that all of its relevant business dealings are with Russian companies. JA-693-755.  It objected to producing further information or documents about its assets or operations in Russia because those assets are not available to satisfy the Judgment by virtue of the Russian judgments.  JA-658-755.  Samaraneftegaz also objected to the discovery requests as procedurally improper for numerous reasons. JA-659-690; JA-693-716.  Yukos Capital eventually moved to compel further discovery responses, as discussed below.

Second, the day after serving its discovery requests, JA-147, and again a few days later, <u>see</u> Notice of Mot., Oct. 24, 2013, ECF No. 148, without waiting for any discovery responses, Yukos Capital sought an order pursuant to C.P.L.R. 5225 compelling Samaraneftegaz to turn over assets sufficient to satisfy the Judgment and restraining and enjoining Samaraneftegaz from transferring assets to any corporate affiliate before paying or bonding the Judgment (the "Turnover Motion").

Samaraneftegaz opposed the Turnover Motion on numerous grounds, including most importantly based on comity and the territorially defined nature of arbitral enforcement under the NY Convention. The requested order to turn over Russian assets would subject Samaraneftegaz to conflicting judicial mandates, and compliance with the order would expose Samaraneftegaz's officials to potential criminal and civil liability in Russia. SPA-8-9. Samaraneftegaz supported its opposition with a declaration on Russian law from Mr. Alexander Muranov, who explained that causing Samaraneftegaz to make a payment contrary to the Neft-Aktiv decisions and Samaraneftegaz's corporate will (as constrained by all applicable legal requirements, including the Neft-Aktiv decisions) would constitute criminal misappropriation and money laundering. JA-308-312. Any employees engaged in such acts would also be subject to civil liability for breach of fiduciary duties. JA-310. Mr. Muranov also explained that a Russian bank could not legally

execute the financial transactions necessary for Samaraneftegaz or its personnel to satisfy the Judgment from its Russian assets, and that any efforts by Samaraneftegaz's personnel to circumvent these controls by concealing the nature of the payment would incur "severe criminal liability." JA-311. Samaraneftegaz also raised statutory objections.

On January 9, 2014, the District Court granted the Turnover Motion. In doing so, it did not address any of Samaraneftegaz's substantive arguments but instead dismissed them all as "recycle[d]," even though Samaraneftegaz had never previously raised them. SPA-9. A subsequent January 23, 2014 order (the "Turnover Order") commanded Samaraneftegaz to "pay the sum of $185,907,785.41," to "post a supersedeas bond in the full amount," or else be "enjoined and restrained from paying any dividends, making loans, or otherwise transferring any assets or funds to its shareholder and corporate affiliates without fair consideration." SPA-12.

On February 19, 2014, Samaraneftegaz moved pursuant to Federal Rules of Civil Procedure 59(e) and 60(b)(6) for an order altering or amending the Turnover Order. Notice of Mot., Feb. 19, 2014, ECF No. 173. The basis for its motion was the District Court's failure to conduct a comity analysis in light of the direct conflict between the Turnover Order's requirement to pay using Samaraneftegaz's Russian assets and the proscription on such payment under

Russian law evidenced by the Russian judgments. This failure was best reflected in the District Court's mistaken conclusion that it had already ruled on Samaraneftegaz's comity-based arguments, when in fact it could not have done so because those issues had never before arisen. Samaraneftegaz also argued that, in light of the manifest hardship created by subjecting Samaraneftegaz and its officers to competing legal requirements in Russia, the Turnover Order should, alternatively, be limited in scope to exclude Russian assets.

Samaraneftegaz supported its motion with expert opinions from Professor Oleg Leonidovich Vasilyev, an Associate Professor at the M.V. Lomonosov Moscow State University with sixteen years of experience teaching criminal law and procedure, including the instruction of prosecutors on "combating corruption and legalisation (laundering) of proceeds of crime and financing of terrorism." JA-827, ¶ 1; JA-850. Professor Vasilyev confirmed that facilitating a payment to Yukos Capital, as the Turnover Order required, would subject Samaraneftegaz's personnel to a substantial risk of criminal or civil liability for facilitating payments as part of a criminal scheme and contrary to Samaraneftegaz's legitimate interests and would also subject Samaraneftegaz to civil liability (as Russian law does not recognize corporate criminal liability). JA-831-847; JA-1205-1222.

These risks are straightforward. For Samaraneftegaz to comply with the Turnover Order, one or more Samaraneftegaz employees would have to instruct a Russian bank to transfer the company's money to Yukos Capital overseas. Such a diversion of the company's funds would expose any employee involved to prosecution for:

- Embezzlement (or misappropriation) under Article 160(3) of the Russian Criminal Code, because it would amount to transfer of money entrusted to the employees without a legitimate purpose recognized under Russian law and contrary to the will of Samaraneftegaz, JA-836-838, ¶¶ 29-35; JA-1212-1216, ¶¶ 26-37; and

- Money laundering under Article 174 of the Russian Criminal Code, because the payment would amount to "completion of the implementation of the money laundering scheme" under which Yukos Capital would receive money that had previously been wrongly taken away from Samaraneftegaz, JA-833-835, ¶¶ 22-28; JA-1209-1212, ¶¶ 17-25.

Similarly, such employees would be exposed to civil liability for a breach of fiduciary duties under Article 53(3) of the Russian Civil Code, because any payment instruction would be contrary to the company's interests as determined by the Russian courts in the Neft-Aktiv decisions. JA-310.

Moreover, the required payment order could not be processed through Russian banks because of the applicable Russian currency control rules. JA-844, ¶ 61; JA-311. Under Articles 24(2) and 23(5) of the Russian Currency Control Law, Samaraneftegaz must report certain information about such a transfer to the

17

bank that would carry it out, including by reporting the existence of the Neft-Aktiv and Russian Enforcement decisions. JA-844, ¶ 59; JA-311. The bank would have to refuse the transaction and report Samaraneftegaz to the authorities under Articles 7(11) and (13) of the Russian Anti-Money Laundering law. JA-844, ¶ 61; JA-311. If Samaraneftegaz tried to hide the existence of the Russian court judgments from the bank, it would be subject to liability under Article 12.25(1) of the Russian Code of Administrative Offences, and any employees who suppressed that information would be subject to further criminal liability under Article 193.1 of the Russian Criminal Code. JA-845, ¶ 62; JA-311.

In furtherance of its efforts to obtain satisfaction of the Judgment despite the criminal and civil liability to which it exposed Samaraneftegaz's personnel, Yukos Capital moved to compel Samaraneftegaz to provide additional discovery responses. Notice of Mot., Feb. 10, 2014, ECF No. 169. In opposition, Samaraneftegaz noted the requests' procedural faults and argued against discovery of Samaraneftegaz's Russian assets. Because under Russian law such assets cannot be used to satisfy the Judgment, they fall outside the scope of post-judgment discovery, whose function is to aid execution. Samaraneftegaz's Opp'n to Mot. to Compel, Mar. 7, 2014, ECF No. 185; SPA-16. Samaraneftegaz's opposition was thus closely tied to the questions addressed in the briefing on the Turnover Order and subsequent Rule 59/60 motion.

On April 2, 2014, the District Court denied Samaraneftegaz's Rule 59(e) and 60(b)(6) motion. SPA-13-14 (the "59(e) Decision"). The District Court again declined to reach the substantial hardship placed on Samaraneftegaz's personnel or to consider whether the Turnover Order was consistent with comity or the NY Convention. Rather, it dismissed these arguments, which it never addressed, as "rehash[ed]," and also concluded that "[a] comity analysis is unnecessary here because there is no real conflict between U.S. and Russian law." SPA-14. The District Court mischaracterized the Neft-Aktiv decisions as merely "a few lines in a civil opinion" invalidating the Loan Agreements that could have no effect on the ability to transfer Russian assets to satisfy a foreign judgment, without addressing Samaraneftegaz's expert evidence that detailed precisely how the Russian decisions operate as a matter of Russian law to prevent such a turnover. Id.

On April 17, 2014, the District Court granted Yukos Capital's motion to compel discovery. SPA-15-17. Without analysis, again in a summary order that did not meaningfully address any of Samaraneftegaz's arguments, the District Court upheld Yukos Capital's discovery requests in full. SPA-16. The District Court also ordered Samaraneftegaz to pay Yukos Capital's attorney's fees incurred on the motion to compel, which it fixed at $78,673.00, SPA-18 (together with the April 17 order, the "Discovery Orders").

19

## STANDARDS OF REVIEW

Although application of the comity doctrine is nominally subject to review for abuse of discretion, the standard applicable in comity cases is "somewhat more rigorous" than in other contexts, and indeed "approaches *de novo* review." JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 422 (2d Cir. 2005).  The same standard governs the District Court's subsequent denial of relief under Rules 59(e) and 60(b) on comity-based grounds. Empresa Cubana del Tabaco v. Culbro Corp., 541 F.3d 476, 478 (2d Cir. 2008) (59(e)); Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 729 (2d Cir. 1998) (60(b)).

The District Court's grant of an "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." E.E.O.C. v. KarenKim, Inc., 698 F.3d 92, 100 (2d Cir. 2012) (citation omitted). The decision to grant an injunction is reviewed for abuse of that discretion.  See id.

The District Court's discovery rulings are reviewed for abuse of discretion.  See, e.g., Hollander v. Am. Cyanamid Co., 895 F.2d 80, 84 (2d Cir. 1990) (discovery); Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027 (2d Cir. 1991) (Rule 37 sanctions).

"'A district court has abuse[d] its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or

rendered a decision that cannot be located within the range of permissible decisions.'" Jiggetts v. AlliedBarton Sec. Servs., 423 Fed. App'x 24, 24 (2d Cir. 2011). This Court owes no deference to the District Court's conclusions of law, including its core conclusion regarding whether U.S. and Russian law conflict, see SPA-14. Rather, as with all questions of law, those presented here are reviewed *de novo*. E.g., JP Morgan Chase, 412 F.3d at 423; see also Fed. R. Civ. P. 44.1 (district court's determination of foreign law "must be treated as a ruling on a question of law").

## SUMMARY OF ARGUMENT

The District Court's orders improperly grant enforcement in Russia to an arbitral award that has been held unenforceable there. The disparate outcomes in the U.S. and Russia each arose in proceedings under the NY Convention, a treaty among the U.S., Russia, and more than 140 other countries that reserves to each sovereign the right to decide for itself whether arbitral awards may be enforced on its territory. In particular, each sovereign may block enforcement that would be contrary to its own public policy and concepts of due process. Here, not only has a Russian court denied enforcement of the Award with finality on valid NY Convention grounds, but Russian courts at all levels of appeal have also held the Loan Agreements on which that Award was premised to be "shams" and part of criminal money-laundering and tax-evasion schemes. Samaraneftegaz presented

21

substantial evidence demonstrating that compliance with the Turnover Order in Russia would require its personnel to violate Russian law, subjecting them to a genuine risk of criminal and civil liability.

First, the District Court erred in dispensing with a comity analysis. The Turnover Order conflicts with Russian law by compelling Samaraneftegaz and its employees to undertake conduct that is contrary to their duties under Russian law, and that would subject them to serious civil and criminal liabilities in Russia. Proper comity analysis requires reversing the Turnover Order because the assets in issue belong to a Russian corporation and are located in Russia, and Russia's interests in applying its own laws and carrying out its own policies, supported by the NY Convention, far outweigh any U.S. interest in enforcing an arbitral award against assets over which the United States has no jurisdiction. Beyond that, the Turnover Order was procured in violation of New York's interests as reflected in its laws' procedural requirements for notice and specificity.

Second, the District Court erred in entering an injunction to enforce the Turnover Order by barring Samaraneftegaz from transferring its own Russian assets until it pays the Award. None of the four injunction factors is met. Moreover, and contrary to the District Court's conclusion, New York's corporations- and property-law statutes do not apply to the Russian assets of a Russian corporation, and therefore do not support entry of an injunction.

Finally, the District Court erred as a matter of law by ordering discovery into Samaraneftegaz's Russian assets. The court further erred by awarding attorneys' fees, as Samaraneftegaz's objections were substantially justified.

Just as this Court and the District Court may coerce compliance with their own decisions within the United States, the Russian courts have the same exclusive authority to allow or disallow enforcement of arbitral awards within Russia. The District Court's orders assume extraordinary extraterritorial jurisdiction, refuse to recognize the exclusive authority of the Russian courts over the enforceability of arbitral awards in their sovereign territory, and abuse discretion over discovery to try to coerce Samaraneftegaz to violate Russian law. Those orders should be reversed.

## ARGUMENT

### POINT ONE

### THE DISTRICT COURT WRONGLY REQUIRED SAMARANEFTEGAZ TO TURN OVER RUSSIAN ASSETS IN SATISFACTION OF THE JUDGMENT

**A.** **The Turnover Order Offends Comity By Commanding Samaraneftegaz To Violate Russian Law, Contrary To Both U.S. and Russian Interests**

It is black-letter law that "'[w]here two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state <u>is required</u> by

23

international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction'" where the comity factors are met. United States v. Davis, 767 F.2d 1025, 1034 (2d Cir. 1985) (emphasis added) (quoting Restatement (Second) of Foreign Relations Law of the United States § 40 (1965)); see also Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct., 482 U.S. 522, 546 (1987) ("Aerospatiale") ("American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state."); United States v. First Nat'l City Bank, 396 F.2d 897, 902 (2d Cir. 1968) (comity analysis required where two states claim power to prescribe).

The District Court's refusal to conduct a comity analysis either before issuing the Turnover Order or in the 59(e) Decision was an error of law. Under a proper comity analysis, the Turnover Order must be reversed.

1. A Proper Comity Analysis Is A Mandatory Prerequisite For An Order Imposing Obligations Inconsistent With Foreign Law

The Turnover Order imposes a mandate on Samaraneftegaz that is squarely at odds with its rights and obligations under Russian law, as defined in the Russian Enforcement and Neft-Aktiv decisions. The former, a final judgment in litigation Yukos Capital itself initiated, barred Yukos Capital from enforcing the Award in Russia, while the latter judgment, after Yukos Capital exhausted all

24

appeals in Russia, invalidated the underlying Loan Agreements and proscribed Samaraneftegaz from making payments under them. The Turnover Order compelled precisely the opposite: payments from Russia under the Award and the Loan Agreements. The conflict is direct and acute.

Prior to issuing the Turnover Order, the District Court was required to assess the extent to which it would require conduct that conflicts with the Russian courts' decisions and Russian law and to consider withholding or limiting its actions in consideration of the comity factors this Court has identified. Davis, 767 F.2d at 1034-35; First Nat'l, 396 F.2d at 902. This analysis was not excused merely because New York's general post-judgment turnover statute, C.P.L.R. 5225, has been interpreted to permit orders with extraterritorial effect. See, e.g., In re Maxwell Commc'n Corp., 93 F.3d 1036, 1047 (2d Cir. 1996) ("When construing a statute, the doctrine of international comity is best understood as a guide where the issues to be resolved are entangled in international relations."); United States v. Aluminum Co. of Am., 148 F.2d 416, 443 (2d Cir. 1945) (Hand, J.) (holding that "general words" are not to be read "without regard to the limitations customarily observed by nations upon the exercise of their powers").

In the Turnover Opinion, the District Court erroneously labeled Samaraneftegaz's call for a comity analysis as "recycle[d]" and ignored it. SPA-9. Without acknowledging the oversight, in the 59(e) Decision the District Court

changed its reason for refusing to conduct a comity analysis, this time opining that

nothing in the Neft-Aktiv decisions would preclude "transferring assets" from

Russia to pay the Judgment and therefore no comity analysis was needed because

there is "no real conflict between U.S. and Russian law." SPA-14. Both

conclusions were erroneous as a matter of law and require reversal.

> a) The Turnover Order Conflicts With The Russian
>    Enforcement Decision

The District Court erred by failing to consider the conflict between the

Turnover Order and the Russian Enforcement Decision, even in its 59(e) Decision.

SPA-14. By its terms, the Turnover Order requires Samaraneftegaz to "turnover

assets to pay the full amount of the Judgment" entered on the Award. SPA-9. As

Samaraneftegaz's only assets are in the Russian Federation, JA-285, ¶ 2; JA-693-

718, the Turnover Order avowedly requires transfer of Russian assets to enforce

the Award.

Because the Russian Enforcement Decision refused Yukos Capital's

request that Samaraneftegaz be required to convey Russian assets to satisfy the

Award, JA-63; JA-65, while the Turnover Order requires Samaraneftegaz to do

just that, the District Court's conclusion that there is "no real conflict" here is in

error. The impossibility of compliance with both sets of court orders is precisely

the type of conflict that gives rise to the need for a comity analysis. See Maxwell,

93 F.3d at 1050 (bankruptcy avoidance claims presented a "true conflict" where "it

is impossible to distribute the debtor's assets in a manner consistent with both [U.S. and English] rules"); see also Hartford Fire Ins. Co. v. Cal., 509 U.S. 764, 798-99 (1993) (conflict exists where "compliance with the laws of both countries is . . . impossible").

Neither of the District Court's decisions explains why it saw no conflict with the Russian Enforcement Decision. If the District Court's silence meant to imply that Samaraneftegaz might comply with the Judgment by voluntarily compromising in Russia the rights that it litigated and won, it misapprehended what constitutes a "conflict" for these purposes. See, e.g., Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 747 (2d Cir. 1994) (recognizing a conflict between U.S. and German trademark law, notwithstanding that the defendant could comply with U.S. law by voluntarily refraining from exercising its trademark rights under German law); see also First Nat'l, 396 F.2d 897, 902 (2d Cir. 1968) ("We would be reluctant to hold ... that the mere absence of criminal sanctions abroad necessarily mandates obedience .... [A] court of one country should make an effort to minimize possible conflict between its orders and the law of a foreign state affected by its decision.").

Nor can Yukos Capital now be heard to complain about the Russian Enforcement Decision or to criticize the Russian judiciary. Unlike, for example, in Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60 (2d Cir. 2004), where a foreign

proceeding was begun with "no apparent motive" just before a decision in ongoing

U.S. litigation, and was "conceal[ed] ... from the District Court and the Court of

Appeals," Yukos Capital initiated the Russian action for the same reason as this

proceeding, and the District Court was fully aware of it – indeed, the District Court

had previously declared that "the Russian forum is undeniably an adequate

alternative forum" under the NY Convention and that "Yukos Capital is not

entitled to deference for its choice of the New York forum." Hr'g Tr. 31:7-16, Jan.

7, 2011, ECF No. 35.

      b) The Turnover Order Also Conflicts With The Neft-Aktiv
           Decisions And Subjects Samaraneftegaz's Officers To
           Significant Criminal Liability

        The Turnover Order likewise imposes obligations on Samaraneftegaz

and its officers that are in direct conflict with the Neft-Aktiv decisions. Those

decisions deprive the Loan Agreements of any validity under Russian law and

establish that Yukos Capital has no legitimate right to payment under them. JA-

834, ¶ 25. Indeed, the Samara Regional Court specifically held that making any

payment to Yukos Capital in the circumstances would "contradict[] the meaning of

[Russian] civil legislation and the principles of good faith, reasonableness and

fairness." JA-89. Because the Neft-Aktiv decisions prohibit the very act ordered

by the District Court (making a payment to satisfy obligations under the Loan

Agreements), there is a direct conflict necessitating a comity analysis.

In the 59(e) Decision, the District Court explained that it saw no conflict with the Neft-Aktiv decisions because, although those decisions "invalidated a contract between the parties on the grounds that the contract constituted a sham transaction," "[i]t does not follow – from a few lines in a civil opinion – that Samaraneftegaz will act contrary to Russian law by transferring assets to satisfy a foreign judgment." SPA-14. The District Court's off-hand dismissal of the Neft-Aktiv decisions as "a few lines in a civil opinion," SPA-14,[5] ignores both the binding effect of those "few lines" under Russian law and the substance of the Russian courts' judgments; as the District Court correctly observed at an earlier stage of these proceedings, the Russian courts "invalidat[ed]" the Loan Agreements because they were executed in furtherance of a criminal scheme to misappropriate Samaraneftegaz's assets, as established in the prior criminal convictions of Yukos Oil's former management. Compare SPA-14, with JA-130.

Those individuals were found guilty of misappropriation and money laundering under Articles 160(3) and 174.1(e) of the Russian Criminal Code because they used their positions to cause Yukos Oil's subsidiaries (including Yukos Capital and Samaraneftegaz) to implement the scheme that included the

---

[5]  Far from merely "a few lines," the Russian courts' holdings describing the illegal nature of the "loans" span many pages in opinions at each level of the judiciary, up through the Supreme Arbitrazh Court. See JA-82-85; JA-106-107; JA-117-118.

Loan Agreements – misappropriating funds from Samaraneftegaz so as to evade Russian taxes and then laundering those ill-gotten funds through sham loans. JA-82-84; JA-106-107; JA-117-118. Because Samaraneftegaz was a victim of the misappropriation, the Russian courts held that requiring it to repay the loans, as the Turnover Order does, would subject Samaraneftegaz once again to misappropriation and would consummate the money laundering scheme. JA-87-89; JA-106-112.

As a matter of Russian law, the Neft-Aktiv decisions are binding in Russia not only on the parties to that litigation (Yukos Capital, Samaraneftegaz, and Neft-Aktiv) but also on all legal and natural persons in Russia (including individual employees of Samaraneftegaz and third-party banks that might process a payment). JA-839-840, ¶ 41. In other words, "a few lines in a civil opinion" do carry significant weight under Russian law, just as the District Court's "few lines" imposing the Turnover Order carry significant weight here, and the District Court erred in asserting otherwise.

Samaraneftegaz presented substantial evidence to the District Court establishing the consequences that follow from the Neft-Aktiv decisions, all of which was ignored by the District Court. For example, as Mr. Muranov explained, "any payment by Samaraneftegaz in connection with the Award and thus the Loan Agreements would necessarily cause Samaraneftegaz to disregard the binding

30

judgment of the Samara Region court," meaning that "Samaraneftegaz is not legally entitled to make any such payment." JA-308, ¶ 3. As Professor Vasilyev confirmed based on his extensive experience and expertise with Russian criminal law and procedure, facilitating a payment in satisfaction of the Judgment would amount to misappropriating Samaraneftegaz's assets for a purpose not recognized as valid under Russian law, contrary to Samaraneftegaz's corporate will and inconsistently with the company's interests, which is a criminal act. JA-839-840, ¶¶ 38-43; JA-1205-1208, ¶¶ 4-13; JA-1211-12, ¶¶ 23, 27-28; JA-1215-1216, ¶¶ 35-37. This would expose any personnel involved not only to criminal prosecution for misappropriation and money laundering, but also civil claims for breach of fiduciary obligations to Samaraneftegaz and its shareholder. JA-308-311; JA-831-847; JA-1207-1222.

And as Professor Vasilyev and Mr. Muranov explained, any bank asked to transfer funds to Yukos Capital would find itself compelled both to decline the request and to report Samaraneftegaz to the authorities. JA-844, ¶ 61; JA-311. Any such attempted payment would attract "considerable attention" from the Russian authorities, who "would rightly take note of any Payment, and would be expected to inquire as to the legal basis for such a transfer," JA-844- JA-832-833, ¶ 20. It would be impossible for the Russian authorities (or anyone else) to find such legal basis because "[t]aking into account the conclusions contained in

31

the [Neft-Aktiv decisions], Russian law would not view the cash funds that Yukos Capital would receive as constituting funds legitimately obtained but rather as the proceeds of tax evasion and money laundering."  JA-834, ¶ 25.  The Neft-Aktiv decisions are final and binding – and, most importantly, will apply to the conduct of Samaraneftegaz and its officers, all of whom are in Russia and subject to Russian authority, regardless of Yukos Capital's critique of the Russian courts' legal reasoning.

In short, Samaraneftegaz made a far more substantial showing of the conflict between the Turnover Order and Russian law than courts have found merited a comity analysis under this Court's jurisprudence.  For example, in <u>JW Oilfield Equip., LLC v. Commerzbank AG</u>, 764 F. Supp. 2d 587 (S.D.N.Y. 2011), the district court held that it was "appropriate" to conduct a comity analysis before ordering turnover of foreign assets, notwithstanding its conclusion that the defendant "will not likely be caught in the crosshairs of German law."  <u>Id.</u> at 597. The court in <u>Commerzbank</u> likewise affirmed the turnover order only after finding that, unlike here, it "d[id] not require the violation of the criminal law of a foreign power" and "it [was] uncertain how the German Court would rule" on the relevant issues.  <u>Id.</u> at 598.

Instead of following such decisions, the District Court inappropriately relied on <u>In re South African Apartheid Litigation</u>, 617 F. Supp. 2d 228, 285

32

(S.D.N.Y. 2009). SPA-14. In <u>Apartheid</u>, the court found no conflict between the case before it and the South African Truth and Reconciliation Commission ("TRC") process where "the TRC process provided immunity against suit only to those who testified voluntarily," and "[d]efendants did not appear before the TRC." 617 F. Supp. 2d at 285-86. The decision is thus inapposite, for in this case both Yukos Capital and Samaraneftegaz appeared, litigated actively, and are bound by the resulting Russian court decisions.[6]

In the face of the conflicting legal obligations, it was error for the District Court to refuse to conduct a comity analysis.

c) Samaraneftegaz Cannot Ignore Russian Law To Comply With An Unrecognized U.S. Court Judgment

Yukos Capital argued below that there was no conflict of law because the existence of the Judgment would immunize Samaraneftegaz's personnel from prosecution in Russia,[7] relying on an opinion by Mr. Gladyshev, who has no notable experience or expertise in Russian criminal law or procedure.[8] To the

---

[6]     <u>Davis</u>, 767 F.2d at 1034, also cited by the District Court, SPA-14, states the comity factors the District Court should have analyzed, but does not speak to whether a conflict between U.S. and foreign law exists. <u>Id.</u> at 1034-36.

[7]     Yukos Capital also advanced the incorrect notion that criminal liability under Russian law cannot attach when money laundering or misappropriation are committed in favor of a third party. JA-470-476, ¶¶ 32-65. This faulty argument rested on Mr. Gladyshev's altering of the language of a Russian Supreme Court resolution and cannot be taken seriously. JA-835, ¶ 26.

[8]     Mr. Gladyshev has become a "house expert" for Yukos Capital and its allies. Before entry of the Judgment, he gave two opinions in this proceeding based on his

extent that the District Court's decisions implicitly adopted that argument, SPA-14, they are wrong on the law for at least three reasons.

First, Yukos Capital's assertion that Russian courts and enforcement authorities would view payment of the Judgment under the Turnover Order as something distinct from a payment in furtherance of the Loan Agreements or under the Award is wrong. JA-464-465, ¶ 4. There is no basis in Russian law for such a distinction. Indeed, Mr. Gladyshev cited no authority in statute, rule, or jurisprudence in support thereof. JA-839, ¶ 38; JA-1206-1207, ¶ 13. There is no distinction between satisfying such void obligations through a voluntary payment or through one made "to satisfy a foreign judgment." The end result is the same, and the District Court was wrong to conclude otherwise. JA-834, ¶ 25, JA-838-842, ¶¶ 36-51; JA-1205-1208, ¶¶ 4-13.

Second, Russian law provides a mechanism for recognizing a foreign judgment as legally effective within Russia, but Yukos Capital has not attempted to invoke that procedure with respect to the District Court's Judgment – presumably

---

claim to a degree in international law and to have had experience with Russian tax, customs, and arbitration law and litigation. See, e.g., Gladyshev Decl. ¶¶ 1-2, Feb. 17, 2012, ECF No. 71. In his declaration in support of the Turnover Order, Mr. Gladyshev simply stated that he "ha[d] been asked to provide [his] views" on Samaraneftegaz's position, Gladyshev Decl. ¶ 1, Nov. 17, 2013, ECF No. 160, but did not claim any expertise in Russian criminal law or procedure, nor did his accompanying c.v. disclose any, see id. at Ex. 1. Elsewhere, Mr. Gladyshev has opined on a variety of topics for former managers, shareholders, and subsidiaries of Yukos Oil. See JA-481.

because it knows that Russian courts will not recognize a foreign judgment that directly conflicts with a domestic decision on the same matter or that is inconsistent with Russian public policy. Here, the Judgment runs afoul of both proscriptions because it is directly at odds with the Russian Enforcement Decision entered following Yukos Capital's attempt to secure confirmation of the Award in the Russian courts. JA-307, ¶ 1; JA-840, ¶ 42; JA-1205-1208, ¶¶ 4-13. This rule is no peculiarity of the Russian system; courts in this country would treat a conflicting foreign judgment precisely the same way. See, e.g., C.P.L.R. 5304(b) (providing for non-recognition of judgments that are "repugnant to the public policy of this state" or "conflict[] with another final and conclusive judgment"); Restatement (Third) of Foreign Relations Law § 482 (1987) (similar conditions). The same rule is well-established internationally.[9] The 59(e) Decision ignored this

---

[9] See, e.g., Convention on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters art. 5(3), Hague Conference on Private International Law, Feb. 1, 1971, available at http://www.hcch.net/upload/conventions/txt16en.pdf (non-recognition where "proceedings between the same parties, based on the same facts and having the same purpose ... have resulted in a decision by a court of the State addressed"); Convention on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters art. 34(3), Jan. 1, 2010, 2007 O.J. (L 339) 3 (a judgment "shall not be recognized" if it is "irreconcilable with a judgment given in a dispute between the same parties in the State in which recognition is sought."); Council Regulation (EC) No. 44/2001, On Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters art. 34(3), Dec. 22, 2000, 2001 O.J. (L 12) 1 (A judgment "shall not be recognized ... if it is irreconcilable with a judgment given in a dispute between the same parties in the Member State in which recognition is sought."); see also Inter-American Convention on Extraterritorial Validity of Foreign

undisputed rule, seemingly assuming that its "foreign judgment" established a recognized payment obligation in Russia.

Third, Yukos Capital treats the Judgment as a magic talisman that inoculates against the *mens rea* necessary for criminal liability. As Yukos Capital would have it, no Samaraneftegaz employee could form the required culpable intent to misuse the company's funds as a matter of <u>Russian</u> law if he or she simply intended to comply with the Judgment or Turnover Order. This is wrong.[10] As Professor Vasilyev explained, "[t]he exhaustive list of circumstances which eliminate the criminality of an act is set out in chapter 8 of the Russian [Criminal Code]" and "[n]one of these provisions would provide a valid defense in connection with the Payment effectuated by [Samaraneftegaz's] Officers solely on the basis of the Judgment and/or Turnover Order, none of which was recognized

---

Judgments and Arbitral Awards art. 2(h), May 8, 1997, 1439 U.N.T.S. 90 (for non-recognition of foreign judgments that are "manifestly contrary to the principles and laws of the public policy (ordre public) of the State in which recognition or execution is sought").

[10] Similarly, compliance with an order of or direction by a foreign state would not absolve a defendant of criminal liability in the United States. <u>See</u>, <u>e.g.</u>, <u>United States v. One Gulfstream G-V Jet Aircraft</u>, 941 F. Supp. 2d 1, 10-11 (D.D.C. 2013) (foreign sovereign's interests receive minimal weight when "the government brings suit to enforce its anti-money laundering laws"); <u>United States v. Brodie</u>, 174 F. Supp. 2d 294, 300 (E.D. Pa. 2001) ("[T]he foreign sovereign compulsion doctrine has never been applied in the criminal context."); <u>Sabre Shipping Corp. v. Am. President Lines, Ltd.</u>, 285 F. Supp. 949, 954 (S.D.N.Y. 1968) ("[W]hether the alleged unlawful activities were engaged in at the direction of the [Japanese] Government ... would not necessarily immunize [defendants] from prosecution or civil responsibility for acts done in United States commerce.").

and enforced in the Russian Federation, in the face of the valid and binding Russian Court Decisions." JA-840-841, ¶¶ 44-45; see also JA-1206-1207, ¶¶ 8-10. It defies credibility to assert that the Judgment – based on an opinion that recognizes it conflicts with the Neft-Aktiv and Russian Enforcement decisions, JA-129-130 – could provide an excuse for ignoring the binding effect in Russia of those decisions.

      2.      The Comity Factors Heavily Favor Vacating The Turnover Order

Neither Yukos Capital nor the District Court disputed that, if a conflict exists, as it does here, the District Court should have analyzed the propriety of the Turnover Order under the comity factors set forth in Section 40 of the Restatement (Second) of Foreign Relations Law, which this Court has adopted. See Davis, 767 F.2d at 1034; First Nat'l, 396 F.2d at 902; see also Commerzbank, 764 F. Supp. 2d at 596 (applying the test to an application for turnover); Ssangyong Corp. v. Vida Shoes Int'l, Inc., No. 03 Civ. 5014 (KMW), 2004 WL 1125659, at *6 (S.D.N.Y. May 20, 2004).[11]  All of the comity factors weigh against ordering Samaraneftegaz to convey Russian assets in this case:

      (a)      The United States has little, if any, "vital national interest" in ordering the turnover of Russian assets by a Russian company to a Luxembourg company; if anything, the U.S. interest favors

---

[11]      An analysis under Section 403 of the Restatement (Third) of Foreign Relations Law of the United States (1987), which this Court has not expressly adopted, would involve similar factors.

respecting the territorial limitations on enforcement embodied in the NY Convention;

(b)　The "hardship that inconsistent enforcement actions would impose" is real and substantial – Samaraneftegaz's personnel are exposed to potential criminal and civil liability in Russia for complying with the Turnover Order;

(c)　"[T]he required conduct is to take place in the territory of the other state" – namely, within Russia;

(d)　The order acts solely on, and in favor of, people and entities who owe their allegiance to foreign states – Russia and Luxembourg; and

(e)　In light of the prohibitions under Russian law on the payment required by the Turnover Order, and the fact that payment would have to be made from Russia through a Russian bank, as a practical matter the Turnover Order cannot "reasonably be expected to achieve compliance."

See Restatement (Second) of Foreign Relations Law § 40.  Had the District Court

properly considered these factors, the Turnover Order would not have issued.

a)　The Interests Of The United States Favor The NY Convention's State-By-State Enforcement Regime

"[T]he balancing of national interests ... is the most important [factor],

as it directly addresses the relations between sovereign nations."  Madanes v.

Madanes, 186 F.R.D. 279, 286 (S.D.N.Y. 1999); Wultz v. Bank of China Ltd., 910

F. Supp. 2d 548, 558 (S.D.N.Y. 2012) (same); Milliken & Co. v. Bank of China,

758 F. Supp. 2d 238, 246 (S.D.N.Y. 2010) (same).

38

Here, the respective "vital interests" of the U.S. and Russia have already been balanced in a carefully crafted treaty – the NY Convention – that was negotiated and ratified by the constitutionally competent branches of government. Cf. Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 955 (D.C. Cir. 1984) ("[D]iplomatic and executive channels are, by definition, designed to exchange, negotiate, and reconcile the problems which accompany the realization of national interests within the sphere of international association."). There can be no interest of the United States in deviating from the agreed arbitral enforcement regime of that treaty by superimposing extraterritorial enforcement orders that conflict with enforcement decisions at the place of enforcement.

Article III of the NY Convention provides that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." June 10, 1958, 330 U.N.T.S. 38, SPA-21 (emphasis added). This expressly territorial provision strikes a clear and unmistakable balance between the portability of international arbitration awards, on the one hand, and, on the other, the sovereign right of each state to ensure that awards repugnant to its laws and public policy are not enforced in its territory.

Thus, "[t]he Convention reserves to each signatory country the right to refuse enforcement of an award where the 'recognition or enforcement of the

award would be contrary to the public policy of that country.'" Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 638 (1985) (quoting NY Convention art. V(2)(b)). Recognizing that "each State has its own concept of what is required by its 'public policy,'" Alan Redfern et al., Redfern And Hunter On International Arbitration § 10.81 (2009), and that "the public policy which may be invoked to resist recognition of an award under Article V(2) is national public policy," Gary B. Born, International Arbitration: Law And Practice 401 (2012), it is inevitable that the same award could simultaneously be enforceable in one contracting state and not be enforceable as against public policy in others. See Belize Soc. Dev. Ltd. v. Gov't of Belize, 668 F.3d 724, 730, 731 n.4 (D.C. Cir. 2012) (multiple judicial proceedings in different jurisdictions are "characteristic" of the NY Convention); JA-782, ¶ 31 (German Supreme Court judgment holding recognition in Germany of a foreign judicial decision granting recognition and enforcement to an arbitral award "would undermine the scope of application of the New York Convention" by failing to "encompass the recognition requirements set forth in Art. 5").

 Likewise, a single arbitral award may be enforceable in the territory of one contracting state but simultaneously unenforceable in the territory of another because of the due process norms of the second. Iran Aircraft Indus. v. Avco Corp., 980 F.2d 141, 145 (2d Cir. 1992) ("Article V(1)(b) 'essentially sanctions the

application of the <u>forum state's</u> standards of due process'") (emphasis added)
(quoting <u>Parsons & Wittemore Overseas Co. v. Societe Generale de L'Industrie du
Papier (RAKTA)</u>, 508 F.2d 969, 975-76 (2d Cir. 1974)).

      Recognizing the structure of the NY Convention, this Court has
admonished that "[f]ederal courts in which enforcement of a foreign arbitral award
is sought cannot dictate to other 'secondary' jurisdictions under the New York
Convention whether the award should be confirmed or enforced in those
jurisdictions." <u>Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas
Bumi Negara</u>, 500 F.3d 111, 124 (2d Cir. 2007). This is also consistent with the
U.S.'s interest against having foreign courts command illegal acts on U.S. territory,
as well as the reciprocal nature of the NY Convention. <u>See</u> <u>Beiser v. Weyler</u>, 284
F.3d 665, 672 (5th Cir. 2002) ("[O]ther countries must respect the rights of U.S.
citizens under the Convention only to the extent that the United States implements
the Convention within its own borders.").

      The Turnover Order disregards these concerns and turns on its head
the NY Convention's "carefully crafted framework for the enforcement of
international arbitral awards," <u>TermoRio S.A.E.S.P. v. Electranta S.P.</u>, 487 F.3d
928, 935 (D.C. Cir. 2007), by mandating that Samaraneftegaz comply with a
foreign arbitral award <u>in Russia</u>, by turning over <u>Russian assets</u>, notwithstanding
that the Russian courts have held the award unenforceable pursuant to the NY

41

Convention.  No U.S. interest justifies such an exorbitant exercise of jurisdiction under the Convention.  Both U.S. and Russian interests, as embodied in the NY Convention, compel the opposite result.

This Court's application of the comity factors in Davis, 767 F.2d at 1035, is illustrative of the appropriate balancing of interests, albeit outside the context of the NY Convention.  There, the Court affirmed the district court's order requiring compliance with a trial subpoena notwithstanding potentially conflicting Cayman law, but only after finding that the U.S. "has a strong national interest in the effective enforcement of its criminal laws," and recognizing as "significant" that the Cayman Attorney General was affirmatively cooperating with the U.S. investigation.  Id. at 1035-36; see also First Nat'l, 396 F.2d at 903 (holding U.S. interest in enforcement of its criminal laws prevailed over Germany's interests in banking secrecy).  In this case, the shoe is on the other foot – Russia, like the U.S., has a strong interest in the enforcement of its criminal laws, an interest that does not abate merely because the District Court held that the Award is enforceable as a matter of U.S. (but explicitly not Russian, JA-132-133) law.  In the circumstances, Russia's interests should not have been overridden by the Turnover Order.

b) The Hardship To Samaraneftegaz And Its
Personnel In Terms Of Potential Civil And
Criminal Liability Is Manifest

The Turnover Order places Samaraneftegaz and its personnel between
Scylla and Charybdis: either face criminal and civil sanctions in Russia or violate
the Turnover Order. This predicament is real – criminal sentences have already
been dispensed in Russia for participation in the very money laundering scheme at
issue here, see supra p. 29; see also JA-834-835, 838, ¶¶ 25-28, 34; JA-1208-1219,
¶¶ 14-45 – and the resulting hardship must weigh heavily in the comity analysis.

Moreover, it is extraordinary for a court to order a foreign national to
violate its home country's laws, as the Turnover Order does. See, e.g.,
Restatement (Third) of Foreign Relations Law § 441(a) ("[A] state may not require
a person to do an act in another state that is prohibited by the law of that state or by
the law of the state of which he is a national."); First Nat'l, 396 F.2d at 902 (court
should minimize conflict); cf. Restatement (Second) of Conflict of Laws § 53 cmt.
d (1971) ("[O]nly in a most extreme situation will a person be ordered to do an act
in a state which is contrary to that state's criminal law."). Neither Yukos Capital
nor the District Court offered any justification for such an extreme imposition here,
for none exists.

c)  The Other Comity Factors Disfavor The Turnover Order

Yukos Capital cannot seriously dispute that the remaining three comity factors under Section 40 of the Restatement weigh against the Turnover Order.  First, the Turnover Order requires Samaraneftegaz to act in the "territory" of a foreign state – Russia.  Second, both of the parties to this action are foreign entities.  Third, because of the liability risks in Russia arising from compliance with the Turnover Order, because Samaraneftegaz and all third parties in Russia must respect the Russian judgments, because all of Samaraneftegaz's assets are in Russia, because its personnel live and work there, and because the company has no connection with the United States other than this case, the Turnover Order cannot "reasonably be expected to achieve compliance."  See Restatement (Second) of Foreign Relations § 40 cmt. e.

When the relevant comity factors are given due consideration, it is inescapable that the Turnover Order should not have issued and should be reversed.

**B.    The Turnover Order Violates New York Law**

The District Court further and independently erred by issuing a Turnover Order in violation of applicable New York law, which governs post-judgment execution proceedings, see Fed. R. Civ. P. 69(a)(1), as well as "the type of property which can be subject to execution," Marshak v. Green, 746 F.2d 927,

930 (2d Cir. 1984).  The relevant New York statutes, contained in C.P.L.R. Article

52, require a turnover order to identify specific assets and impose specific service

requirements – which the New York courts hold to be jurisdictional rather than

merely technical.  The Turnover Order fails to heed either of these mandates.

        First, New York law does not authorize a court to issue a blanket

order to pay a judgment, but rather specifies that "[a] money judgment may be

enforced against any <u>debt</u> … [or] any <u>property</u> which could be assigned or

transferred …" or against a "proper garnishee." C.P.L.R. 5201.  In turn, under

Section 5225 of the C.P.L.R., "where it is shown that the judgment debtor is in

possession or custody of money or other personal property," the Court may "order

that the judgment debtor pay the money" or "deliver any other personal property"

in satisfaction of the judgment.  SPA-68.

        The CPLR contemplates only an order directed at specific assets as a

form of execution, not a recapitulation of the judgment itself.  <u>See</u> <u>Interpool Ltd. v.</u>

<u>Patterson</u>, No. 89 Civ. 8501 (LAK), 1995 WL 105284, at *1 (S.D.N.Y. Mar. 13,

1995) (allowing plaintiff to file a turnover motion "identifying the <u>specific assets</u>

in question" (emphasis added)).  Further, this Court requires that a judgment

creditor requesting a turnover order show (1) "that the asset it seeks to collect has

been made available to judgment creditors by § 5201" and (2) "that the party

against which the creditor has chosen to proceed has the ability to produce the

asset." <u>Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo</u>, 190 F.3d 16, 21 (2d Cir. 1999). The Turnover Order violates this clear statutory requirement; because it fails to identify the specific assets or other personal property intended to be subject to turnover, that order is invalid.[12]

None of the cases cited by the District Court support issuing a non-specific restatement of the judgment in the guise of a Section 5225 turnover order. <u>Koehler v. Bank of Bermuda, Ltd.</u>, 911 N.E.2d 825, 828, 12 N.Y.3d 533, 537 (2009), involved specifically identified stock certificates. <u>See</u> <u>Samsun Logix Corp. v. Bank of China</u>, 929 N.Y.S.2d 202, 31 Misc. 3d 1126(A), at *4 (N.Y. Sup. Ct. 2011) (declining to enter turnover order, distinguishing <u>Koehler</u> on the basis that there "the plaintiff sought the turnover of an identifiable asset"). <u>Gryphon Domestic VI, LLC v. APP International Finance Co.</u>, 836 N.Y.S.2d 4, 8, 41 A.D.3d 25, 29 (N.Y. App. Div. 2007), involved certain identified categories of assets where "[t]he plaintiffs submitted documents showing that the defendants owned the above assets." While the turnover order in <u>CIMC Raffles Offshore (Sing.) Pte. Ltd. v. Schahin Holding S.A.</u>, No. 13 Civ. 52(JSR), 2013 WL

---

[12] Yukos Capital cannot premise its failure to specify assets on Samaraneftegaz's discovery responses. Yukos Capital sought leave for and then filed its turnover motion on October 18 and 24, 2013, respectively, without waiting for Samaraneftegaz's responses to its October 17, 2013 discovery requests. <u>See</u> JA-147; JA-156, ¶ 2; JA-616, ¶¶ 3-4. In any event, Samaraneftegaz's objections to the discovery requests do not justify noncompliance with Section 5225's statutory requirement for specificity.

4082973, at *1 (S.D.N.Y. Aug. 6, 2013), involved an order referring generically to "funds sufficient to satisfy the judgment," the motion seeking that order was "unopposed," and the court did not address the specificity requirement of C.P.L.R. Article 52.

Second, New York law requires that a party seeking a turnover order must serve notice of the turnover motion "on the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested." C.P.L.R. 5225. New York courts have held this establishes a jurisdictional prerequisite to the issuance of any Section 5225 turnover order. Oil City Petrl. Co. v. Fabac Realty Corp., 418 N.Y.S.2d 51, 52, 70 A.D.2d 859, 859 (N.Y. App. Div. 1979), aff'd, 50 N.Y.2d 853, 407 N.E.2d 1334 (1980); Banco Popular N. Am. v. Philian Designs LLC, 852 N.Y.S.2d 109, 109, 48 A.D.3d 368, 369 (N.Y. App. Div. 2008). Merely providing notice of a turnover motion on a debtor's counsel, without satisfying the specific requirement for service on the debtor, is insufficient. See Gryphon Domestic, 836 N.Y.S.2d at 7-10, 41 A.D.3d at 28-32; Ballek v. First Media Mktg., 879 N.Y.S.2d 847, 849, 24 Misc. 3d 532, 534, (N.Y. Sup. Ct. 2009).

Yukos Capital did not serve Samaraneftegaz by registered or certified mail, nor did it serve Samaraneftegaz with the turnover motion in the same manner as a summons. Instead, it merely served notice on Samaraneftegaz's U.S. counsel.

47

Cert. of Serv. ¶ 2, Oct. 25, 2013, ECF No. 151. The Turnover Order therefore is jurisdictionally defective and must be quashed.

## POINT TWO

## THE DISTRICT COURT ERRED IN ISSUING AN INJUNCTION TO SUPPORT THE TURNOVER ORDER

### A. Rule 65's Requirements Were Not Met

The portion of the Turnover Order enjoining Samaraneftegaz from "paying any dividends, making loans, or otherwise transferring assets to its shareholder and corporate affiliates without fair consideration," SPA-12, was defective, failing to satisfy the requirements of Federal Rule of Civil Procedure 65. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (injunction may be granted if there is (1) irreparable harm, (2) for which legal remedies are inadequate, (3) the balance of hardships weighs toward the movant, and (4) the injunction would not disserve the public interest).

### 1. Yukos Capital Failed To Establish Irreparable Harm

Yukos Capital made no showing of irreparable harm, which "is perhaps the single most important prerequisite." Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002). The only supposed injury here was Samaraneftegaz's non-payment of the Award and purported dissipation of assets during 2011 and 2012. SPA-6. But the actions cited by the District Court – payment of dividends

48

and extension of loans in 2011 and 2012 – cannot satisfy this element for at least four reasons.

First, Samaraneftegaz's non-payment of the Award before entry of the Judgment is irrelevant because at that time there was no payment obligation under U.S. law.  See Robert Lewis Rosen Assocs., Ltd. v. Webb, 473 F.3d 498, 504 (2d Cir. 2007); cf. Schlumberger Tech. Corp. v. United States, 195 F.3d 216, 220 (5th Cir. 1999) ("an arbitral award has no legal effect without the stamp of judicial approval").

Second, at least since February 2011 – i.e., prior to entry of the Judgment – the judgment in Yukos Capital's Russian Enforcement Action relieved Samaraneftegaz of any obligation to commit its Russian assets to pay the Award. See JA-66.

Third, Samaraneftegaz did not move assets to avoid execution.  It had and has no assets in the United States.  See JA-359-360, ¶ 5.  Any Russian funds it transferred in Russia to other Russian entities did not change Yukos Capital's ability to collect against those funds.  Rather, the barriers to collection that Yukos Capital faces stem from the underlying illegality of the Loan Agreements and unenforceability of the Award in Russia, not any purported spiriting away of assets.

Fourth, even if Samaraneftegaz's Russian assets could be used to pay Yukos Capital on the Award and Loan Agreements, the payment of dividends and

extension of loans could not have materially decreased Yukos Capital's ability to collect because Samaraneftegaz remains a substantial and well-capitalized company with significant on-going operations and revenue.

Thus, Yukos Capital failed to establish that it suffered any injury (much less an "irreparable" one) before the Turnover Order. As to potential future injury, it only provided speculation and guesswork that Samaraneftegaz might dissipate assets later, which is insufficient. See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 340 (1999) ("[I]rreparable injury requirement [is] not ... met by unsubstantiated allegations that a defendant may dissipate assets."). The District Court's invocation of Pashaian v. Eccelston Properties, Ltd., SPA-6, is misplaced. In Pashaian, evidence showed a collusive agreement with an affiliate to transfer assets beyond the reach of the judgment creditor with "actual intent" to defraud and "completed actions to frustrate a judgment, rather than an inferred intention to take future such actions." 88 F.3d 77, 87 (2d Cir. 1996). Here, there is no evidence of any improper transfer of assets by Samaraneftegaz following entry of the Judgment that could frustrate execution. To the contrary, Samaraneftegaz confirmed by sworn affidavit that it has taken no such action. JA-360, ¶ 6.

2.      Yukos Capital Has Adequate Remedies At Law

Post-judgment interest as provided by federal statute is an adequate

legal remedy to compensate Yukos Capital for any delay in enforcing the

Judgment.  See Competex, S.A. v. Labow, 783 F.2d 333, 337 (2d Cir. 1986)

("[P]ost-judgment interest ... is ordinarily the only 'punishment' for delay in

paying judgment debts.").

3.      The Balance Of Hardships Favors Samaraneftegaz

The District Court based its lopsided balancing of hardships on the

opinion that Samaraneftegaz could avoid any hardship by "either post[ing] a bond

or pay[ing] the judgment."  SPA-6-7.  But it is impossible for Samaraneftegaz to

do either without running afoul of the proscriptions of Russian law on such uses of

its Russian assets.  As Samaraneftegaz explained below, and as Yukos Capital's

Russian law expert agreed, Russian law would not distinguish between posting a

bond and paying the Judgment directly with Russian assets in these circumstances.

JA-846-847, ¶¶ 66-71; JA-970, ¶ 98.

Moreover, the District Court's reasoning assumes its conclusion.  In

principle, every judgment debtor could "either post a bond or pay the judgment."

If that sufficed to tip the balance of hardship in favor of the judgment creditor, as

51

the District Court assumed, it would render the balancing test a nullity any time a turnover order is sought.  That is not the law.[13]

4.     The Injunction Disserves The Public Interest

In finding the public interest satisfied, the District Court failed to consider that the effect of its injunction is felt within the territory of a foreign sovereign and is intended to compel compliance with an order that is inconsistent with final decisions by courts of that sovereign.  In this respect, the injunction offends comity and cannot meet the public interest requirement for the reasons explained above.  See supra Point I.A.  See also Bano v. Union Carbide Corp., 361 F.3d 696, 716 (2d Cir. 2004) (finding injunctive relief inappropriate "when it would interfere with the other nation's sovereignty"); United States v. Ross, 302 F.2d 831, 834 (2d Cir. 1962) ("Of course no court should order the performance of an act in a foreign country when that act will violate the foreign country's laws."); In re "Agent Orange" Prod. Liab. Litig., 373 F. Supp. 2d 7, 45 (E.D.N.Y. 2005) ("Requests for extraterritorial injunctions often raise serious concerns for

---

[13]     The District Court's balancing also ignored the impact on Samaraneftegaz's shareholder and affiliates – absent third parties over which the District Court does not have jurisdiction.  Harm against such third parties weighs against an injunction. See Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987) (financial interests of non-party investors weighed against issuing injunction even though the type of environmental injury at stake "will usually favor the issuance of an injunction to protect the environment").

sovereignty and enforceability which compel denial."); see also Restatement (Third) of Foreign Relations Law § 441(a).

In sum, the District Court relied on legally incorrect factors in finding the required elements for entry of an injunction under Rule 65 and therefore abused its discretion by enjoining Samaraneftegaz.

## B.   New York Law Does Not Govern Samaraneftegaz's Distribution Of Its Russian Assets

The District Court's conclusion that its injunction was also appropriate under C.P.L.R. 5222, SPA-4-5, was erroneous because it failed to consider that the payment of dividends by Samaraneftegaz, a Russian company, is properly governed by Russian law.  The District Court opined that "[a]ccording to New York law," dividends by judgment debtors automatically amount to "fraudulent conveyances" under Section 5222 because they are "deemed not to be transfers for fair consideration."  SPA-5 (quoting Pashaian, 88 F.3d at 86).  It was wrong to evaluate the propriety of dividend payments or other transfers between Samaraneftegaz and its shareholder or affiliates under New York law for at least two reasons.

First, dividend payments are internal corporate matters, which are generally evaluated under the law of the place of incorporation.  See United States v. Funds Held ex rel. Wetterer, 210 F.3d 96, 106 (2d Cir. 2000).  Samaraneftegaz is a Russian company; Russian law should apply.

Second, under New York's choice of law rules, disputes over property, including those arising from fraudulent conveyance claims, are decided under the law of the jurisdiction with the "most significant relationship" to the property and parties. Bravado Int'l Grp. Merch. Servs. v. Ninna, Inc., 655 F. Supp. 2d 177, 193 n.14 (E.D.N.Y. 2009) (citing Restatement (Second) of Conflict of Laws § 222 (1971)). Here, the dispute involves conduct outside the United States between a Russian company and its Russian affiliates (with a Luxembourg company as petitioner), and the enjoined conduct would take place entirely within the Russian Federation. Thus, New York cannot have the most significant relationship to the parties, the property, or the dispute at issue; the propriety of transfers from Samaraneftegaz to corporate affiliates must turn on Russian law. See Fromer v. Yogel, 50 F. Supp. 2d 227, 239 (S.D.N.Y. 1999) (citing Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir. 1980), and applying this principle to resolve choice of laws governing plaintiff's fraudulent conveyance claim).

By virtue of the Russian judgments, transfers by Samaraneftegaz to affiliates – whether for "fair consideration" or otherwise – would not be improper under Russian law. Yukos Capital's arguments to the contrary erroneously assume the enforceability of the Judgment in Russia, see JA-475-477, ¶¶ 60-65, which has

no basis in fact or law.  Accordingly, there is no basis to enjoin such conveyances

under C.P.L.R. 5222.

## POINT THREE

### THE DISTRICT COURT ERRED IN ORDERING FURTHER DISCOVERY RESPONSES AND AWARDING ATTORNEY'S FEES

**A.     The Requested Further Information Is Outside The Scope Of Proper Post-Judgment Discovery**

The plain language of Rule 69(a)(2) establishes that post-judgment

discovery is permissible only "in aid of the judgment or execution."  Fed. R. Civ. P.

69(a)(2); see also 13 James Wm. Moore et al., Moore's Federal Practice § 69.04

(3d ed. 2013) ("The purpose of discovery under Rule 69(a)(2) is to allow the

judgment creditor to identify assets from which the judgment may be satisfied.").

This means the target of such discovery must be assets susceptible to attachment or

other forms of execution and information reasonably calculated to assist in

collecting on them.  Otherwise, the requested discovery fails on relevancy grounds.

EM Ltd. v. Argentina, 695 F.3d 201, 207 (2d Cir. 2012), aff'd Argentina v. NML

Capital, Ltd., 573 U.S. __, slip op. (June 16, 2014) ("The scope of discovery under

Rule 69(a)(2) is constrained principally in that it must be calculated to assist in

collecting on a judgment."); Minpeco, S.A. v. Hunt, No. 81 CIV. 7619(MEL),

1989 WL 57704, at *1 (S.D.N.Y. May 24, 1989) ("[D]iscovery obtained pursuant

to Rule 69(a) should be reasonably calculated to lead to assets that can be levied

upon pursuant to a writ of execution."); 13 Moore's Federal Practice § 69.04 (3d ed. 2013).

Insofar as Yukos Capital's motion to compel focused on information concerning assets of Samaraneftegaz in Russia, it failed to meet its threshold burden of demonstrating that such discovery is relevant under Rule 69. See Perkins v. Chelsea Piers Mgmt., No. 11 Civ. 8998(ALC)(JCF), 2012 WL 4832814, at *1 (S.D.N.Y. Oct. 10, 2012) (burden on requesting party to show relevance). "Our courts generally lack authority in the first place to execute against property in other countries," NML, 573 U.S. __, slip op. at 9, and Yukos Capital could not enforce the Judgment against Russian assets. Indeed, in its briefing in the parallel appeal of the Judgment, Yukos Capital conceded that "Yukos Capital cannot enforce the Award in Russia." Yukos Capital S.a.r.l. v. OAO Samaraneftegaz, No. 13-3357-cv, Brief of Petitioner-Appellee, 58 n.20 (2d Cir. April 11, 2014).[14] For reasons noted above, the Judgment likewise would not be recognized and enforced there. See supra pp. 34-36. Information about Samaraneftegaz's Russian assets therefore could not be used in aid of the Judgment or execution.

---

[14] This concession alleviates any concern about whether particular property is or is not subject to execution, such as noted in British Int'l Ins. Co., 2000 WL 713057, at *5 ("whenever post-judgment asset discovery was sought, the Court would inevitably become mired in debates about the likelihood that the party seeking discovery would eventually locate any unencumbered assets").

The District Court thus erroneously concluded that the requested additional discovery might assist in collecting the Judgment.  First, the District Court surmised that further responses would be relevant because "even if all assets are in Russia, '[t]he fact that a judgment creditor may have difficulty reaching those assets is not determinative of relevance."  SPA-16 (citing British Int'l Ins. Co. v. Seguros La Republica, S.A., No. 90 Civ. 2370(JFK)(FM), 2000 WL 713057, at *5 (S.D.N.Y. June 2, 2000)).  But the issue here is not that it might be "difficult" to enforce in Russia; Yukos Capital concedes that it is impossible for it to do so.

The Supreme Court has recognized that post-judgment discovery requests for "information that could not lead to executable assets in the United States or abroad" are improper "because information that could not possibly lead to executable assets is simply not 'relevant' to execution in the first place."  NML, 573 U.S. __, slip op. at 10.  In that case, "'there [was] no use getting information about something that might lead to attachment in Argentina because that would be useless information' as no Argentinian court would allow sovereign property to be attached within the country."  EM Ltd., 695 F.3d at 204-205; NML, 573 U.S. __, slip op. at 3.  So too here, the Russian courts would not allow attachment of Samaraneftegaz's assets in Russia after Yukos Capital lost its Russian Enforcement Action and lost its appeals in the Neft-Aktiv proceedings.  The

information Yukos Capital seeks is "simply not 'relevant' to execution in the first place."  <u>NML</u>, 573 U.S. __, slip op. at 10.

Second, the District Court erroneously postulated that further responses were relevant because "information may well be useful in enforcing the [j]udgment against Samaraneftegaz's assets that are held by third parties."  SPA-16. Samaraneftegaz confirmed in its verified interrogatory responses and sworn affidavits that all of its responsive counter-parties are Russian companies.  JA-395-414; JA-359, ¶ 5; JA-1178-1182.  Yukos Capital cannot seek enforcement against such Russian third parties because the Russian judgments "are to be mandatorily complied with by all Russian legal entities and individuals" including third parties, JA-839-840, ¶ 41, and the Russian courts will not issue attachment or other enforcement orders that would conflict with the Russian judgments, <u>see</u> <u>supra</u> pp. 34-36.  There is thus no basis for the District Court's supposition that the requested discovery "may well" be used to attach assets held by such third parties.

Third, without citing any evidence or reason for doubting the veracity of Samaraneftegaz's duly verified interrogatory responses, the District Court opined that the entire swath of Yukos Capital's massive discovery requests is relevant because "Yukos Capital need not take Samaraneftegaz at its word that all of its assets are in Russia."  SPA-16.  Samaraneftegaz's interrogatory responses and affidavits demonstrate that all of the assets about which Yukos Capital has

inquired are in the Russian Federation.  JA-395-414; JA-359, ¶ 5; JA-1178-1182.[15]

Interrogatories are designed to create a presumption that a party's response should be taken "at its word" – the party must verify the responses under oath, subject to sanctions.  Fed. R. Civ. P. 33; 7-33 Moore's Federal Practice § 33.101 (3d ed. 2013); see also In re World Trade Ctr. Disaster Site Litig., 722 F.3d 483, 487-88 (2d Cir. 2013).  If verified interrogatory responses are not to be taken "at [their] word," discovery would have no end.[16]

Fourth, the District Court declined, *sub silentio*, even to entertain Samaraneftegaz's various other objections to the vastly overbroad nature of Yukos Capital's requests, much less to afford them the "most careful consideration" they

---

[15]    Although Yukos Capital asserted that it need not take Samaraneftegaz's interrogatory responses "at face value," in the case on which it relied, Banco Central De Paraguay v. Paraguay Humanitarian Foundation, Inc., No. 01 Civ. 9649(JFK), 2006 WL 3456521, at *9 (S.D.N.Y. Nov. 30, 2006), the defendant did not submit any interrogatory responses, much less verified answers, unlike Samaraneftegaz.  Id. at *1-2.  Yukos Capital made a feeble attempt to create a factual dispute about whether Samaraneftegaz sells its products outside of Russia, JA-1117-1167, but the District Court did not even address its wholly unfounded allegations, see JA-1168-1171; JA-1178-1182.

[16]    Likewise, S.D.N.Y. Local Civil Rule 33.3(b) allows interrogatories only "if they are a more practical method of obtaining the information sought than a request for production or a deposition."  It would turn that rule on its head if the responses were not then taken "at [their] word" and the responding party were then also required to produce massive quantities of documents to confirm the interrogatory responses.

were due, <u>Aerospatiale</u>, 482 U.S. at 546.[17]  Contrary to the District Court's

characterization of Yukos Capital's discovery requests as being limited to

"documents and communications relating to loans made by Samaraneftegaz,

dividends paid by Samaraneftegaz, and potential claims brought by

Samaraneftegaz, among others," SPA-16, the requests are in fact of staggering

breadth going well beyond anything reasonably calculated to aid in execution of

the Judgment.  By way of example, Yukos Capital's document request number

nine requests all documents relating to Samaraneftegaz's "work" since July 2010,

JA-621, a request that on its face seeks data about daily operational matters, among

other things, that can have no use in executing the Judgment.  Its other requests are

only slightly narrower, seeking in the cumulative every conceivable category of

document Samaraneftegaz might have.  Such demands for all of a party's

documents go far beyond what is permissible.  <u>See</u> Fed. R. Civ. P. 26(b)(2)(C);

<u>Universitas Educ., LLC v. Nova Grp., LLC</u>, No. 11 Civ. 1590(LTS)(HBP), 2013

WL 3328746, at *7 (S.D.N.Y. July 2, 2013); <u>Brown v. Coleman</u>, No. 07 Civ.

---

[17]     Samaraneftegaz timely and properly raised these and other objections to the
discovery requests and preserved them in its opposition to the motion to compel.
Samaraneftegaz's Opp'n to Mot. to Compel at 12-13 & n.13, ECF No. 185.
Samaraneftegaz raised additional relevancy objections, that the interrogatories
exceeded Rule 33(a)(1)'s numerical limit, that the discovery requests were
duplicative and cumulative and used improperly expansive definitions, and that
discovery was interposed for an improper purpose.

1345(LMM)(RLE), 2009 WL 2877602, at *2 (S.D.N.Y. Sept. 8, 2009); 6 Moore's Federal Practice § 26.60[5] (3d ed. 2013).

Finally, the District Court erred in ignoring all of Samaraneftegaz's objections because Samaraneftegaz "failed to satisfy its obligations under both the Judgment and Turnover Order." SPA-16. Post-judgment discovery is always directed at a party that has not satisfied the judgment, and to overrule valid discovery objections on that basis would remove all limitations on post-judgment discovery and render the discovery punitive. Cf. Pac. Fisheries, Inc. v. United States, 484 F.3d 1103, 1111 (9th Cir. 2007) ("[T]he purpose of discovery is to aid a party in the preparation of its case, not to punish its opponents for past sins."); Aerospatiale, 482 U.S. at 546 (warning against using discovery "for the improper purpose of motivating settlement").

Because Yukos Capital's discovery requests are not "reasonably calculated" to lead to the production of information about property subject to execution, the order granting its motion to compel was an abuse of discretion and should be reversed.

## B. The District Court Erred In Awarding Attorney's Fees

Because the underlying grant of the motion to compel should be reversed, the District Court's adjunct fee award should be vacated, too.

Even if the order compelling production is not vacated, a fee award is not warranted. The District Court "must not" award costs if "the opposing party's nondisclosure, response, or objection was substantially justified." Fed. R. Civ. P. 37(a)(5)(A)(ii). The District Court's disagreement with Samaraneftegaz's objections does not mean the objections were not substantially justified. Klein v. Torrey Point Grp., LLC, No. 12 Civ. 1190(KPF), 2013 WL 5761401, at *20 (S.D.N.Y. Oct. 23, 2013) (ordering discovery but denying costs because "[t]hough Defendant's relevancy argument has proved unavailing, it was not without substance"); Thai Lao Lignite (Thai.) Co. v. Gov't of the Lao People's Dem. Rep., No. 10 Civ. 5256(KMW), 2011 WL 4111504, at *9 (S.D.N.Y. Sept. 13, 2011) (ordering discovery about assets but denying costs where responding party argued that the assets in question were immune from attachment). To the contrary, Samaraneftegaz's objections were well justified, reasoned, and supported, and the foundation of its relevance arguments, ignored by the District Court, was recently reaffirmed by the Supreme Court. The fee award should therefore be vacated.

## CONCLUSION

The Turnover Order and the Discovery Orders should be reversed, and the District Court's award of attorney's fees in connection with the Discovery Order should be vacated.

Dated:  July 11, 2014
        Washington, D.C.

                              Respectfully submitted,

                              /s/ *Matthew D. Slater*

Kathleen M. Sullivan          Matthew D. Slater
Yelena Konanova               CLEARY GOTTLIEB STEEN &
Cleland B. Welton II            HAMILTON LLP
QUINN EMANUEL URQUHART &       2000 Pennsylvania Avenue, NW
  SULLIVAN, LLP                Washington, DC  20006
51 Madison Avenue, 22nd Floor Telephone: 202-974-1500
New York, NY 10010            Facsimile: (202) 974-1999
Telephone: 212-849-7000       mslater@cgsh.com
Facsimile: 212-849-7100

       *Attorneys for Respondent-Appellant OAO Samaraneftegaz*

# CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(C)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,959 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word Version 14 in 14-point Times New Roman font.

Dated:      July 11, 2014
               Washington, D.C.

                      Respectfully submitted,

                      */s/ Matthew D. Slater*

Kathleen M. Sullivan          Matthew D. Slater
Yelena Konanova            CLEARY GOTTLIEB STEEN &
Cleland B. Welton II           HAMILTON LLP
QUINN EMANUEL URQUHART &    2000 Pennsylvania Avenue, NW
   SULLIVAN, LLP              Washington, DC  20006
51 Madison Avenue, 22nd Floor    Telephone: 202-974-1500
New York, NY 10010           Facsimile: (202) 974-1999
Telephone: 212-849-7000        mslater@cgsh.com
Facsimile: 212-849-7100

*Attorneys for Respondent-Appellant OAO Samaraneftegaz*